# United States Court of Appeals
## For the First Circuit

No. 02-2359

OLGA GAYDAR; OLEKSANDR STEPANOV,

Plaintiffs, Appellees,

v.

SOCIEDAD INSTITUTO GINECO-QUIRURGICO Y PLANIFICACION FAMILIAR
d/b/a CLINICA GINECO-QUIRURGICA; HECTOR E. ORTIZ-PEREZ;
IRIS MALDONADO; CONJUGAL PARTNERSHIP ORTIZ-MALDONADO;
SINDICATO DE ASEGURADORES PARA LA SUSCRIPCION CONJUNTA DE SEGURO
DE RESPONSABILIDAD MEDICO-HOSPITALARIA ("SIMED"),

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Lipez, and Howard, Circuit Judges.

Jose A. Miranda Daleccio, with whom Ramonita Dieppa Gonzalez
and Miranda Cardenas & Cordova were on brief, for appellants.
Guillermo Mancari, with whom Ramon M. Gonzalez was on brief,
for appellees.

September 29, 2003

**LIPEZ, <u>Circuit Judge</u>.** This appeal challenges a substantial verdict against an abortion clinic for medical malpractice. The defendants ask us to vacate the jury verdict in favor of the plaintiffs, claiming that the court made a number of erroneous evidentiary rulings during the trial. After a careful review of the record, we affirm the verdict for the plaintiffs.

**I.**

Plaintiffs-appellees Olga Gaydar and Oleksandr Stepanov visited Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar d/b/a Clinica Gineco-Quirurgica ("the clinic" or "Clinica") on April 24, 2000, for the purpose of obtaining an abortion for Gaydar. Taking into consideration the date of her last menstrual period, Gaydar estimated that she was five weeks pregnant. After arriving at the clinic and completing the medical history forms provided to her, Gaydar underwent a pelvic examination, followed by a suction curettage[1] procedure intended to terminate her pregnancy. Following the procedure, she was given two instruction sheets that contained information outlining what symptoms could be expected after an abortion and what symptoms should be considered abnormal. The instructions also indicated

---

[1] A suction curettage is a method of early abortion in which a small tube attached to a suction machine is inserted through the patient's dilated cervix into the uterus, after which the contents of the uterus are emptied into the tube.

that she should return to the clinic two weeks after the procedure for a follow-up appointment.

In the days after the procedure, Gaydar continued to experience nausea and breast tenderness; as she testified at trial, she "felt like [she] was still pregnant." She purchased and performed a home pregnancy test, which returned a positive result. She also began experiencing pain in the lower area of her abdomen. On May 5, 2000, eleven days after the procedure, Gaydar and Stepanov returned to the clinic, and explained to a nurse and the receptionist that Gaydar was experiencing symptoms of pregnancy, had received a positive result on a home pregnancy test, and was in pain. The clinic employees explained to Gaydar and Stepanov that such reactions were normal following an abortion. Gaydar and Stepanov returned home without having seen a doctor that day.

On the morning of May 9, Gaydar began experiencing severe pain in her abdomen. She was unable to get out of bed and was nauseated. Stepanov took Gaydar to the emergency room at Pavia Hospital where she was initially diagnosed as suffering from septic shock, which the emergency room doctors attributed to her abortion. Dr. Natalio Bayonet, a gynecologist on staff at the hospital, arrived to treat Gaydar. After reviewing a sonogram, he diagnosed her as suffering from a ruptured ectopic pregnancy.[2] Gaydar was

---

[2] An ectopic pregnancy is a form of pregnancy in which implantation of the fertilized egg occurs outside of the uterus, oftentimes in one of the fallopian tubes.

stabilized in the emergency room and given a series of blood transfusions, after which Dr. Bayonet performed emergency surgery on her, extracting the remains of the ruptured ectopic pregnancy and removing her right fallopian tube. Gaydar was hospitalized for seven days following the surgery, five days of which were spent in the intensive care unit. As a result of the rupture and the surgery, Gaydar now has only one healthy fallopian tube and also has a scar on her abdomen.

Gaydar and Stepanov[3] brought a diversity action against the clinic, Dr. Hector Ortiz-Perez,[4] the owner of the clinic and the doctor who allegedly performed the attempted abortion, and the clinic's insurance carrier, Sindicato de Aseguradores para la Suscripcion Conujunta de Seguro de Responsabilidad Medico-Hospitalaria ("SIMED"). Gaydar alleged, inter alia, that the clinic and Dr. Ortiz-Perez negligently failed to detect her ectopic pregnancy on April 24 and May 5, thereby leading to the rupture of her fallopian tube and her need for emergency surgery on May 9. At trial, Gaydar called Dr. Jose Rodriguez as an expert witness. He testified that the clinic's conduct varied from the applicable standard of care when its employees failed to give Gaydar any

---

[3] Gaydar and Stepanov are married. Other plaintiffs included Gaydar's mother, Ludmilla, her brother Oleg, and her sisters Daria and Julia. Prior to trial, all plaintiffs except Gaydar and Stepanov dismissed their claims voluntarily.

[4] The plaintiffs also named Iris Maldonado, Dr. Ortiz-Perez's wife, and their conjugal partnership as defendants.

-4-

laboratory tests, including a pregnancy test, prior to the attempted abortion. Dr. Rodriguez also testified that the clinic employees with whom Gaydar spoke on May 5 should have called a doctor to examine her, given her symptoms. As part of her case-in-chief, Gaydar also called Dr. Bayonet, the gynecologist who performed her emergency surgery at Pavia Hospital. We discuss his testimony more fully in Part II.A, infra. In opposition, the defendants called Dr. Carlos Roure, who testified that there was nothing wrong with the care Gaydar received on April 24 and May 5 at the clinic because her symptoms did not indicate the presence of an ectopic pregnancy. After the presentation of evidence, the jury returned a verdict finding the defendants jointly and severally liable to Gaydar for $550,000 and to Stepanov for $75,000. The defendants now appeal from the entry of judgment on that verdict.

## II.

The defendants allege a series of trial errors: (1) the district court erred in permitting Dr. Bayonet, listed by the plaintiffs as a witness who would testify about his treatment of Gaydar, to also testify as an expert witness; (2) the district court should have excluded plaintiffs' expert witness, Dr. Jose Rodriguez, because he was not a gynecologist; (3) the district court showed bias against the defendants and abortion clinics; and (4) Dr. Rodriguez exceeded the bounds of his expert knowledge when

he testified that medical records had been altered.  We address
these arguments in turn.

## A. Inappropriate Expert Testimony

### 1.  Dr. Bayonet's Testimony

The testimony at issue involved colloquies between Dr.
Bayonet and plaintiffs' counsel on direct examination, and
subsequently between Dr. Bayonet and defendants' counsel on cross-
examination, as well as some questions posed by the Court.  On
direct examination, after Dr. Bayonet answered a series of
questions regarding Gaydar's condition in the emergency room, her
eventual diagnosis, and her emergency surgery, Gaydar's counsel
began the following exchange:

> Q:  Before she was taken to Pavia, what type
> of exams could have been performed on her to
> detect the ectopic pregnancy?
>
> MS. DIEPA [Defendants' counsel]:  Objection.
> Way beyond the scope.
>
> THE COURT:  Why do you say it is beyond the
> scope?  So what.  He's a physician.  He is a
> gynecologist.  He can answer those questions
> perfectly.  I don't see the problem with this.
> Overruled.
>
> MR. MIRANDA [Defendants' co-counsel]:  And
> then, Your Honor, he has been offered to
> render testimony on his treatment of this lady
> at the time of the treatment, not before.
>
> THE COURT:  It doesn't matter.  Go ahead.
>
> [DR. BAYONET]:  Can you repeat the question,
> please?

Q: First of all, was it possible before May 9 when she was taken to the Pavia Hospital, whether it was possible to detect that [Gaydar] had developed an ectopic pregnancy?

A: Well, certainly a positive pregnancy test is usually done. You could probably have done an ultrasound examination. And this would probably have detected either a pregnancy in the tube or a dual pregnancy.[5] But I wasn't there, so I don't know what standard procedures they do in the facility where the abortion was done.

This was the extent of this line of inquiry of Dr. Bayonet on direct examination by Gaydar's counsel. At the end of the cross-examination of Dr. Bayonet, defendants' counsel had this exchange with him:

Q: And when [Gaydar] went to Clinica on April 24, 2000, she was approximately five weeks [pregnant]?

A: Yes.

Q: Is it possible to palpate an ectopic pregnancy five weeks old with no other signs or symptoms?

A: Well, if you do a real good pelvic exam, perhaps you could, but it could be easily missed.

The defendants argue on appeal that the court erred in overruling their "beyond the scope" objection during the direct examination of Dr. Bayonet because this objection advised the court that the questions posed by Gaydar's counsel required Dr. Bayonet

---

[5] A dual pregnancy is a pregnancy in which one embryo gestates in the uterus while another embryo gestates in the fallopian tube.

to provide expert testimony when he was only called as a fact witness. The defendants also contend that the court exacerbated its initial error by asking Dr. Bayonet a number of questions that also called for the testimony of an expert witness. This questioning came after defendants' counsel had completed the cross-examination of Dr. Bayonet with the inquiry, quoted above, about the possibility of missing, during a pelvic exam, an ectopic pregnancy at five weeks gestation. The judge then immediately started his own line of questioning, which we set forth fully:

> THE COURT: Let me ask you something, Doctor, myself, because I have doubt. If you had been called -- this is hypothetical, of course. If you had been called to make this abortion yourself, what would you have considered doing under the circumstances in April? What would be the right thing to do?
>
> THE WITNESS [Dr. Bayonet]: Well, I'm speaking from the point of view of a gynecologist.
>
> THE COURT: Sure.
>
> THE WITNESS: Number one, I would have verified that the pregnancy test was positive. If you suspect an ectopic pregnancy, perhaps you could do -- if your pelvic exam demonstrated an adnexal mass, then probably an ultrasound would be in order. If the ultrasound demonstrated an intrauterine pregnancy, then there is no need to go any further, and you could go ahead and do the abortion.
> A dual pregnancy would s[h]ow an ectopic pregnancy in the tube and/or in the uterus with a gestational sac and a fetal pole. In that case you could go ahead and do the abortion if you had that information. If you had an ultrasound, that would help in

-8-

order to establish whether this pregnancy is in the uterus or not.

THE COURT: Okay. Would you take a look at [Gaydar's medical record from Clinica on April 24], if you are so kind, and let me know whether that information was developed by the physician.

THE WITNESS: The record -- I don't see any laboratories here. There is no laboratory indicating that she has a positive pregnancy test. It is probably just by history that she had her last period in March 5, 2000. But I can't see any evidence of a pregnancy test.

THE COURT: What about --

THE WITNESS: Also there is no mention of any ultrasound or anything like that.

THE COURT: Okay. Thank you.

MS. DIEPA [Defendants' Counsel]: Your Honor, may we ask a few questions regarding that last line of testimony[?]

THE COURT: Sure.

BY MS. DIEPA:
Q: Doctor, I'm showing you -- you have in your hands . . . the original records from Clinica Gineco-Quirurgica, and I direct your attention to the line where it says "ovaries and adnexa." Are you there, Doctor? Isn't it a fact that it says, "no masses palpable"?

A: It said "free, no tenderness. No masses palpable."

Q: And you just testified here that an ultrasound will be appropriate if the physicians palpate a mass; am I correct?

A: Yes, that would be an indication of that.

THE COURT: Doctor, is the information on that record complete for you to decide whether this doctor did the right thing?

THE WITNESS: Well, he says that he didn't find any masses. He says that there was no tenderness in the adnexa. He says that the uterus was five weeks gestational size. From what it said here in this record, all that I can say is that probably he suspected that there was an intrauterine pregnancy.

MS. DIEPA [Defendants' Counsel]: We have no further questions, Your Honor.

THE COURT: Was that enough to go ahead with the abortion without more?

THE WITNESS: I would have liked to see a pregnancy test, number one. I know in these clinics they don't do other tests.

THE COURT: I'm not asking you about what they do in the clinics. I'm asking the gynecologist, Dr. Bayonet, would you have gone ahead with this abortion under those circumstances.

THE WITNESS: No, I would not.

The defendants never raised any objections to the court's questions.

2. Plain Error Review.

In objecting to plaintiffs' question to Dr. Bayonet about the tests that the abortion clinic could have performed to detect Gaydar's ectopic pregnancy, the defendants never explained to the district court the argument that they now make on appeal – namely, that such a question converted Dr. Bayonet from a fact witness to an expert witness, and hence ran afoul of Fed. R. Evid. 701 and

-10-

Fed. R. Civ. P. 26 (requiring the designation of expert witnesses prior to trial).[6]  Therefore, even if the question posed to Dr. Bayonet by plaintiffs' counsel called for expert testimony (a question we do not decide), the defendants did not preserve their objection to this question.  Moreover, defendants cannot object to any expert witness questions posed by the court to Dr. Bayonet because defendants adopted Dr. Bayonet as an expert witness in their cross-examination of him after the questions posed by plaintiffs' counsel and the court.  Hence, we review the argument about the testimony of Dr. Bayonet only for plain error.[7]

---

[6]  Fed. R. Evid. 701 provides:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Civ. P. 26(a)(2) provides in relevant part:

(A) In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

[7]  I have set forth here the respected views of my two colleagues on the reasons for plain error review of the entire colloquy with Dr. Bayonet.  I view the situation somewhat differently, believing that defendants adequately apprised the court of the basis for their objection to the question from plaintiffs' counsel to Dr. Bayonet about the tests that the abortion clinic could have performed, and that the court erred in overruling their objection.  Hence, I would subject this ruling to harmless error review.  I also disagree that defendants adopted Dr.

-11-

To demonstrate plain error, the defendants must show "(1) an error was committed; (2) the error was 'plain' (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice." Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999). We will reverse only if the error "seriously affected the fairness, integrity or public reputation of the judicial proceedings." Id. (quoting Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir.), cert. denied, 519 U.S. 927 (1996)). We apply the plain error doctrine "stringently" in civil cases. Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 6 (1st Cir. 2002). Without suggesting that there was any error in the court's ruling on the testimony of Dr. Bayonet, we focus on the prejudice element of the plain error doctrine.

---

Bayonet as an expert witness, believing that their questions to him were prompted by the court's decision to allow Dr. Bayonet to offer expert testimony. Nevertheless, I agree that plain error review applies to the questions posed by the court because the defendants were required to object separately to the court's questions pursuant to Rule 614, which provides that "objections to . . . interrogation by [the court] may be made at the time or at the next available opportunity when the jury is not present." Fed. R. Evid. 614(c). Defendants never made such an objection. In the end, however, the differing views of my colleagues and me on these procedural niceties do not matter. Even where I would apply harmless error review, I find no prejudice justifying a new trial. I further agree with my colleagues on their application of plain error review to the court's questioning of Dr. Bayonet. Hence we focus on the prejudice element of plain error review in evaluating Dr. Bayonet's testimony.

Even though Dr. Bayonet's testimony supported the plaintiffs' theory of the case, including the testimony objected to by defendants, the defendants immediately established through cross-examination of Dr. Bayonet that it would be easy to miss an ectopic pregnancy at five weeks through a pelvic exam. The defendants also used Dr. Bayonet's training and experience as a gynecologist for their own benefit with their questions to him after the inquiries of the court. Moreover, Dr. Bayonet's opinion testimony was only a brief supplement to the testimony of Dr. Rodriguez, plaintiffs' expert, who testified at length that before performing the abortion, the doctor at the clinic should have ordered a number of laboratory tests, including a CBC (Complete Blood Count) test, pregnancy test, and urine test. He also testified that Gaydar should have been referred to a doctor on May 5 when she returned to the clinic complaining of abdominal pains and pregnancy-related symptoms. In Dr. Rodriguez's opinion, if a doctor had examined Gaydar on May 5, he reasonably could have detected her ectopic pregnancy.

In opposition, defendants' expert, Dr. Roure, testified that Gaydar's ectopic pregnancy could not have been discovered on the day she went in for her abortion because the fetus was too small and would not have been noticed during the course of a routine pelvic exam. He also stated that on neither April 24 nor May 5 did Gaydar present symptoms of an ectopic pregnancy that

-13-

would have prompted a doctor to order a non-routine test, such as a sonogram, that may have detected the pregnancy in the fallopian tube.

Viewed in context, the testimony Dr. Bayonet gave in response to plaintiffs' questions and those of the court was minimal in comparison to the substantial testimony given by Dr. Rodriguez and Dr. Roure. Additionally, Dr. Bayonet's response -- that he believed a positive pregnancy test is usually done and that an ultrasound could probably have been done that may have detected the ectopic pregnancy -- did not specifically indict the defendants' procedures or choices. On cross-examination, as noted, Dr. Bayonet offered some opinion testimony that was helpful to defendants. We are confident, therefore, that his limited opinion testimony in response to plaintiffs' question and the questions posed by the court did not affect the substantial rights of the parties and, therefore, did not rise to the level of prejudice required by plain error review.

**B.  Judicial Bias**

In a related argument, the defendants contend that the district court engaged in improper "judicial activism which displayed a predisposition and bias in favor of the Plaintiffs and against abortion clinics, such as the defendants [sic] facility." Defendants suggest that this bias was illustrated in the court's questioning of Dr. Bayonet, and also in a number of comments the

court made to defendants' counsel during sidebars. In these comments, the court suggested to defendants' counsel that the clinic had committed negligence and should have settled the case prior to trial.[8]

The defendants never raised this bias argument with the district court. See Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 857 (1st Cir. 1998) ("Claims of judicial partiality must be raised at the earliest moment that a litigant becomes cognizant of the purported bias, and certainly not for the first time on appeal."). Therefore, we also review this contention only for plain error.

It is within the court's discretion to question a witness. See Fed. R. Evid. 614(b). The questions themselves were phrased in a neutral manner. The judge permitted follow-up cross-examination. The comments of concern, while reflecting skepticism about defendants' theories and evidence, were made only at sidebar. See Rodriguez-Hernandez, 132 F.3d at 857 (dismissing defendants' argument of judicial bias and citing fact that allegedly biased comments were made away from the jury). In his jury instructions, the judge specifically instructed the jury that "if you felt that

---

[8] For example, at sidebar, the court told Ms. Diepa, defendants' counsel: "I think you should have settled this case. Let me tell you, you have a big problem on your hands." Later, during that same sidebar, the court stated to Ms. Diepa: "Don't be surprised by the kind of verdict that you are going to get in this case."

I became impatient with the attorneys at some point in time or that I scolded them or that I had some sort of colloquy with them, you should not be influenced by that." We credit the value of such instructions on plain error review. United States v. Houlihan, 92 F.3d 1271, 1286 (1st Cir. 1996) (concluding that absent some evidence that the jurors ignored those instructions, "the trial court's instructions . . . precluded a finding of plain error"). We find no plain error warranting a new trial.

## C. Qualifications of Plaintiffs' Expert Witness

In their pre-trial disclosures, the plaintiffs designated Dr. Jose Rodriguez Crespo as their expert witness. Dr. Rodriguez is a medical doctor and general practitioner who acknowledged that he was not a specialist in gynecology or obstetrics. Defendants filed a motion in limine to exclude his testimony, arguing that he was not qualified to testify as an expert regarding ectopic pregnancies because he was not a doctor of obstetrics or gynecology. The court denied the motion, ruling that "the issues raised [by the defendants] go to the weight of the testimony and not to the Daubert exclusion of the same." Defendants renewed their objection at trial, and the judge again denied it. "We review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard." United States v. Diaz, 300 F.3d 66, 84 (1st Cir. 2002).

-16-

The trial court must determine that the proffered expert witness is "qualified as an expert by knowledge, skill, experience, training, or education" before permitting his testimony to be presented to the jury. Fed. R. Evid. 702. This gatekeeping function requires the trial court to determine, given the proffered expert's background, whether the scientific, technical, or other specialized knowledge he offers "will assist the trier better to understand a fact in issue." United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995) (quoting United States v. Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993)). The mere fact that Dr. Rodriguez was not a gynecologist does not mean that he was not qualified to give expert testimony regarding Gaydar's pregnancy. The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline. Mitchell v. United States, 141 F.3d 8, 15 (1st Cir. 1998); Payton v. Abbott Labs, 780 F.2d 147, 155 (1st Cir. 1985). In fact, it would have been an abuse of discretion for the court to exclude Dr. Rodriguez's testimony on the sole basis that his medical speciality was something other than gynecology or obstetrics. See Holbrook v. Lykes Bros. S.S. Corp., 80 F.3d 777, 782 (3d Cir. 1996) ("[T]he district court erred by finding that Dr. Carpenter was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in 'definitive cancer diagnosis.'"). Although defendants also argued

that Dr. Rodriguez "had only performed two [pelvic examinations] since his internship, and he had never palpated an ectopic pregnancy," we cannot say that, given Dr. Rodriguez's education and training, the district court abused its discretion in holding that his testimony would still be helpful to the jury in resolving this case.

## D. Testimony on Record Alteration

The defendants argue that the district court also erred in permitting Dr. Rodriguez to testify as "a calligraphy expert." Dr. Rodriguez testified that the copy of Gaydar's medical records produced by the defendants for trial contained more information than the copy Gaydar herself received from the clinic after her abortion. Dr. Rodriguez also testified that the records the clinic produced for trial appeared to have more than one type of handwriting on them. He stated that these modifications to the record were not done in an appropriate manner: "If there is going to be any alteration or modification made by a doctor or any medical personnel to a patient's record, to a hospital record or a record of any medical procedure, it has to be made with the initials of the person who has made those alterations in order to keep a record of the alteration that was actually made."

The observations of Dr. Rodriguez regarding Gaydar's medical records required no expertise in calligraphy. One does not need expertise in handwriting analysis to recognize the handwriting

-18-

of two different people on the same document.  Defendants have cited absolutely no case law holding otherwise.  Dr. Rodriguez was also qualified to testify about the appropriate procedures for altering or modifying hospital or patient records.  We reject the contention that Dr. Rodriguez's testimony was improper.

### III.

Finding no basis for undoing the work of the jury, we <u>affirm</u> the entry of judgment on the jury's verdict in favor of Gaydar and Stepanov.

<u>So ordered</u>.